

FILED

OCT 20 2009

CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## SOUTHERN DIVISION

| | |
|---|---|
| ENERGY MAINTENANCE SERVICE, LLC, a Delaware Limited Liability Company, | CIV. 09- 4155 |
| Plaintiff, | |
| vs. | **COMPLAINT AND JURY DEMAND** |
| ReNEW ENERGY MAINTENANCE HOLDINGS, LLC, a South Dakota Limited Liability Company, ReNEW ENERGY MAINTENANCE, LLC, a South Dakota Limited Liability Company, JAMES P. MIKEL, GARY R. FISH, NICHOLAS D. SIDDENS, and MICHAEL A. SHERMAN, | |
| Defendants. | |

Plaintiff, Energy Maintenance Service, LLC ("EMS"), by its undersigned attorneys and for its complaint against the defendants, ReNew Energy Maintenance Holdings, LLC ("ReNew Energy Holdings"), ReNew Energy Maintenance, LLC ("ReNew Energy") ("ReNew Energy Holdings" and "ReNew Energy" are collectively referred to herein as "Renew"), James P. Mikel, Gary R. Fish, Nicholas D. Siddens, and Michael A. Sherman (Mikel, Fish, Siddens and Sherman are collectively referred to herein as the "Individual Defendants") (collectively the Individual Defendants and ReNew are referred to herein as the "Defendants"), states as follows:

## Background

1.      EMS is in the business of delivering high-quality, cost-effective services to the wind energy development and generation industries, including construction, engineering, operations, maintenance, component remanufacturing and component repair services.  EMS is a wholly-owned subsidiary of Broadwind Energy, Inc. ("Broadwind").  Broadwind provides an array of integrated supply-chain solutions to the power infrastructure industry, with an emphasis on the wind energy sector. Broadwind's products and services include wind tower and precision gear manufacturing, heavy steel fabrication, wind facility construction support, wind turbine installation and maintenance, and wind turbine transportation services. Broadwind's customers include many of the leading wind turbine manufacturers and wind farm owners worldwide. Broadwind's other wholly owned subsidiaries include Badger Transport, Inc., Brad Foote Gear Works, Inc., R.B.A. Inc., and Tower Tech Systems Inc. (collectively referred to herein as "Broadwind Affiliated Entities").

2.      The Individual Defendants were highly-placed executives within EMS's operations and accounting organization, constituting a significant portion of its operations and accounting senior management.  All of the Individual Defendants left EMS within the space of approximately one month.  They have now formed two affiliated companies to compete with EMS:  ReNew Energy Holdings and ReNew Energy.

3.      While they were still working for EMS, some or all of the Individual Defendants pursued business opportunities for their new company which they could have pursued on behalf of EMS. In addition, the Individual Defendants have misappropriated trade secrets of EMS to use in competing with EMS.  Since the formation of ReNew, certain employees of EMS have

2

resigned unexpectedly and EMS has reason to believe that such employees have been recruited by or may be acting in concert with Defendants.  The Individual Defendants' perfidious actions should be enjoined forthwith and they should be required to pay EMS the damages it has incurred because of those actions.

### Jurisdiction and Venue

4.      This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) in that the matter in controversy exceeds $75,000 and EMS and the Defendants are citizens of different states.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) in that the cause of action arose in this District and most of the Defendants are located in this District.

### Parties

6.      Plaintiff, EMS, is a Delaware limited liability company with its principal place of business in Gary, South Dakota.  It is in the business of delivering high-quality, cost-effective services to the wind energy development and generation industries throughout the United States, including in South Dakota.  Those services include construction, engineering, operations, maintenance, component remanufacturing and component repair services.

7.      The sole member of EMS is Broadwind, a Delaware corporation with its principal place of business in Naperville, Illinois.  For purposes of diversity jurisdiction, EMS takes the citizenship of Broadwind, its sole member.

8.      Defendant, ReNew Energy, is a South Dakota limited liability company with its principal place of business in Brandon, South Dakota.  Through its web page, www.renewenergymaint.com, and otherwise, ReNew offers services identical to those offered by EMS.

3

9.      Defendant, ReNew Energy Holdings, is a South Dakota limited liability company with its principal place of business in Brandon, South Dakota. On information and belief, ReNew Energy Holdings is a member of ReNew Energy.

10.     Defendant, James P. Mikel ("Mikel"), is a citizen of Minnesota. Mikel was hired by EMS on or about June 10, 2002, as a Service Manager and was promoted over the years to the position of Vice President, Operations. On or about August 17, 2009, Mikel resigned his position at EMS. He is now President of ReNew Energy.

11.     Defendant, Gary R. Fish ("Fish"), is a citizen of South Dakota. Fish was hired by EMS on or about August 11, 2008, as Vice President, Finance and Accounting. On or about August 23, 2009, Fish resigned his position at EMS. He is now CFO of ReNew Energy.

12.     Defendant, Nicholas D. Siddens ("Siddens"), is a citizen of South Dakota. Siddens was hired by EMS on or about January 6, 2001, as a Technician and was promoted over the years to the position of Operations Account Manager. On or about August 10, 2009, Siddens resigned his position at EMS. He is now Service Manager of ReNew Energy.

13.     Defendant, Michael A. Sherman ("Sherman"), is a citizen of South Dakota. Sherman was hired by EMS on or about July 10, 2000, as a Technician and was promoted over the years to Operations Manager. On or about August 10, 2009, Sherman resigned his position at EMS. He is now Operations Manager of ReNew Energy.

### Mass Resignations

14.     On or about Monday, August 10, 2009, Sherman resigned his position as Operations Manager at EMS with a projected last day of employment of Friday, August 21, 2009. Sherman reported to his manager, Mikel, that he was leaving EMS in order to become an

4

independent contractor, in which role he would erect turbines for a customer of EMS. Despite Sherman's written notice indicating that his last day of employment with EMS would be August 21, 2009, Sherman requested that his last day of employment be Friday, August 14, 2009.

15.     On the same day, Monday, August 10, 2009, Siddens resigned his position as Operations Account Manager at EMS with a projected last day of employment of Friday, August 21, 2009. Despite Siddens's written notice indicating that his last day of employment with EMS would be August 21, 2009, Siddens requested that his last day of employment be Friday, August 14, 2009.

16.     On or about Friday, August 14, 2009, Sherman and Siddens worked their last day with EMS. On the same day, August 14, 2009, they informed Debra Full, Operations Coordinator, and others at EMS that they were leaving to become self-employed.

17.     On or about Tuesday, August 17, 2009, Mikel notified Peter Dawes, then President of EMS ("Dawes"), that he was resigning his position as EMS's Vice President, Operations effective immediately.

18.     On or about Wednesday, August 19, 2009, Fish notified Dawes that he was resigning his position with EMS with his projected last day of employment being Tuesday, September 1, 2009. After Fish submitted his resignation on August 19, 2009, he utilized his remaining vacation time for the next two days. On or about Sunday, August 23, 2009, Fish then notified Dawes that he had accepted another position with a competitor of EMS over the weekend and was terminating his employment with EMS immediately.

5

**Wrongful Acts**

19.     From at least May 2009 through their respective resignation dates, the Individual

Defendants were utilizing EMS company assets and resources in order to form the competing

ReNew entities for their own personal gain. On or about August 19, 2009, the Articles of

Organization for ReNew Energy Holdings were executed. The Articles of ReNew Energy

Holdings were subsequently filed with the South Dakota Secretary of State on August 21, 2009.

Both of these dates occurred before Fish's resignation date of August 23, 2009. Furthermore,

Fish, as a member of ReNew Energy Holdings, executed a Consent Letter in order to allow

ReNew Energy to use the name "ReNew Energy" on August 26, 2009. On or about August 26,

2009, the Articles of Organization for ReNew Energy were executed. The Articles of ReNew

Energy were subsequently filed with the South Dakota Secretary of State on August 28, 2009.

20.     Since the formation of the competing ReNew entities, certain Defendants have

contacted EMS customers and vendors. In addition, in connection with such contacts, certain

Defendants have attempted to persuade EMS customers and vendors to refrain from informing

EMS of such contact and to otherwise keep information relating to the formation and competitive

activities of ReNew secret.

21.     From at least May 2009 through their respective resignation dates, Fish and Mikel

used EMS company assets and resources in order to obtain funding for their competing ReNew

entities for their own personal gain. Both Fish's and Mikel's EMS computers evidence that they

were working on ReNew business plans and sending out emails to various third parties in an

attempt to raise capital for the competing ReNew entities while still employed by EMS. Fish's

6

conduct in this regard is especially offensive because raising capital was one of his principal duties for EMS -- a duty he failed to accomplish while he was employed by EMS.

22.     Upon information and belief, from at least May 2009 through their respective resignation dates, Sherman and Siddens, in collusion with Fish and Mikel, used EMS company assets and resources in order to divert past and prospective customers from EMS to ReNew for their own personal gain. When Sherman announced that he was resigning from EMS, he indicated that he was going to be erecting towers for one of EMS's top ten customers (measured by revenue generated). The project which Sherman indicated that he was going to be performing for said customer is a project that EMS had been approached about. The only way that Sherman would have known about this project was through his employment with EMS. Sherman then utilized EMS business information for his own personal gain.

23.     While employed by EMS, the Individual Defendants informed certain of EMS's vendors and customers that they might be leaving the employ of EMS and requested those vendors and customers to provide their personal contact information so that the Individual Defendants could contact them after they were settled in their new venture.

24.     Since at least May 2009, Fish and Mikel have been attempting to misappropriate for their own personal gain a unique and key EMS strategic business initiative considered to be a protected trade secret among EMS and Broadwind Affiliated Entities. In connection with this misappropriation, Fish and Mikel have contacted third party competitors of EMS and Broadwind Affiliated Entities in an attempt to form strategic partnerships and/or establish financing for the capital required for ReNew to execute the strategic business initiative on its own.

25.      Prior to the Individual Defendants returning their laptops and cell phones to EMS before leaving, each of them misappropriated certain of EMS's protected confidential information and business documents by copying certain documents from their laptops onto an external storage device.  This information included, among other things, EMS's human resources organization charts, proposals sent to certain customers, presentations prepared for industry associations, safety forms that were utilized by EMS, technical reference specifications for certain customers, rate sheets for certain EMS customers, pricing information for certain EMS customers, EMS logos and letterhead, models that EMS developed in responding to bids, EMS labor rate sheets, bid packages for certain EMS customers, contracts with certain customers, customer background information relating to the requests for proposal from certain customers and potential customers, form agreements that have been developed by EMS, financial data relating to EMS and its customers, manuals relating to EMS's Basic Safety Training program, technical specification documents relating to EMS's customers, and presentations relating to EMS's capabilities.

26.      Upon information and belief, ReNew has been contacting EMS employees at EMS offices in order to solicit them to leave the employ of EMS.  In its efforts to persuade said EMS employees to leave EMS's employ, ReNew has disparaged EMS and Broadwind Affiliated Entities.

### Applicable Restrictions

27.      As EMS is a wholly-owned subsidiary of Broadwind, each employee, officer and director of EMS -- including the Individual Defendants -- is subject to Broadwind's Code of Ethics and Business Conduct as adopted by Broadwind's Board of Directors on December 13,

8

2007 (the "Code"). All the Individual Defendants acknowledged in writing that they read and understood their responsibilities under the Code.

      28.    The Conflict of Interest section of the Code prohibits employees from having an interest adverse to EMS. In fact, this section, at page 3, specifically states:

> [E]mployees are generally free to engage in outside activities of their choice. It is important, however, that such activities do not adversely affect Broadwind's business, involve misuse of Broadwind position or resources, divert for personal gain any business opportunity from which Broadwind may profit, or constitute a potential source of discredit to the Broadwind name. The following is a non-exhaustive list of examples of prohibited conflicts of interest for employees and officers of Broadwind:
>
> - Consulting with or employment in any capacity with a competitor, supplier or customer of Broadwind.
>
> - Having a substantial equity, debt, or other financial interest in any competitor, supplier or customer.
>
> - Having a financial interest in any transaction involving the purchase or sale by Broadwind of any product, material, equipment, services or property.
>
> - Misusing Broadwind's confidential or proprietary information, including the unauthorized disclosure or use of such information.
>
> - Using materials, equipment or other assets of Broadwind for any unauthorized or undisclosed purpose.
>
> - Receiving loans or guarantees of obligations from the Company without Board of Director authorization.

      29.    The Company Opportunities section of the Code reinforces this concept by prohibiting employees, officers and directors from using EMS property or information for personal gain or competing with EMS directly or indirectly, and specifically states:

> Employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

> Employees, officers and directors are prohibited (without the
> specific consent of the Board of Directors or an appropriate
> committee thereof) from (1) taking for themselves personally
> opportunities that are discovered through the use of Company
> property, information or their position, (2) using Company property,
> information or their position for personal gain, or (3) competing
> with the Company directly or indirectly.

(*Id.* at 5.)

30.    The Intellectual Property and Confidential Information section of the Code

prohibits the disclosure of EMS's or its customers' confidential information and further

specifically defines what is considered to be confidential information:

> Confidential information is information that is not generally known
> or readily available to others.  It includes non-public information that
> might be of value to competitors of the Company, or harmful to the
> Company or its customers, if it were disclosed.  It must not be shared
> with others outside Broadwind except pursuant to approved business
> relationships or when required by law.  Confidential information
> includes, but is not limited to, intellectual property and trade secrets,
> business plans and information, marketing and sales programs and
> information, customer and prospective customer information and
> lists, pricing information and policies, financial information, and any
> other information which the Company deems confidential.

(*Id.* at 5.)

31.    The Protection and Proper Use of Company Assets section of the Code outlines

employees' duties in relation to protection of the company's assets, prohibits the use of EMS

assets for non-EMS business purposes, and specially states:

> Collectively, employees, officers and directors have a responsibility
> for safeguarding and making proper and efficient use of the
> Company's assets.  Each of us has an obligation to prevent the
> Company's property from loss, damage, misuse, theft,
> embezzlement, waste or destruction.  We seek to ensure that the
> Company equipment, supplies and other assets are used for
> legitimate business purposes unless otherwise specifically
> authorized, and to protect all tangible and intangible Company
> property.

10

(*Id.* at 6.)

32.     Each employee, officer and director of EMS -- including the Individual

Defendants -- is subject to EMS's Employee Handbook (the "Handbook"). The Handbook is

distributed to each employee, officer and director of EMS, and each such individual is required

to attest that they will comply with the Handbook as a condition of employment. As such, the

Individual Defendants were duty bound to comply with the Handbook but failed to do so and

violated the Handbook with their aforementioned actions.

33.     In the Guidelines for Conduct & Accountability section, the Handbook

specifically prohibits certain types of behavior that are deemed seriously inappropriate and may

result in termination at EMS. These include the following:

> 8.     Larceny, misappropriation, or unauthorized
> possession or use of property belonging to EMS, or to any
> employee, visitor, or business associate of EMS.
>
> 11.    Unauthorized possession, removal, use,
> copying or reading of EMS records, printed material, or
> disclosure of information contained in such records to
> unauthorized persons.
>
> 25.    Company documents and internet sites are
> the sole property of EMS and should be considered
> confidential.

(*Id.* at 6.)

34.     The Individual Defendants violated the prohibitions set forth in items 8, 11, and

25 above by removing for their own use EMS's company documents.

35.     Fish executed an Offer Letter dated July 18, 2008 with EMS (the "Offer Letter")

which outlined the terms and conditions of his employment with EMS. The Offer Letter

contained specific provisions relating to the treatment of confidential information, namely

"[f]rom time to time you will be involved with confidential information either relating to EMS

11

or EMS customers. EMS expects that you treat all information as confidential." Fish's misappropriation of EMS's confidential information is a direct violation of the condition of employment that he agreed to in the Offer Letter.

36.     On or about December 16, 2002, Mikel executed a Confidentiality Agreement with EMS (the "Confidentiality Agreement") which prohibits the disclosure of any of EMS's "Confidential Information", which was defined as "trade secrets, customer lists, business plans, projections, and information pertaining to any of the foregoing or to research, business development, finances, marketing, acquisition of supplies and products, pricing, needs and requirements of customers, potential customers, business expansions or acquisition." The Confidentiality Agreement further requires that Mikel prevent disclosure of any "Confidential Information" under the Confidentiality Agreement and provides that Mikel will be held liable for any breach of the terms of the Confidentiality Agreement. Mikel breached the terms of the Confidentiality Agreement when he misappropriated EMS's confidential information for his own personal use.

## Count I

### (Breach of Duty of Loyalty – Individual Defendants)

37.     EMS realleges and incorporates herein the allegations made in paragraphs 1 through 37 above.

38.     S.D. Codified Laws § 60-2-5 provides that: "Any person at the person's own request to do that which is more for the person's advantage than for an employer shall use great care and diligence to protect the interest of the employer."

12

39.     S.D. Codified Laws § 60-2-13 provides that: "An employee who has any

business to transact on the employee's own account, similar to that entrusted to the

employee by the employer, shall always give the employer the preference."

40.     S.D. Codified Laws § 60-2-10 provides that: "Anything that an employee

acquires by virtue of employment, lawfully or unlawfully, during or after the term of

employment belongs to the employer, excepting any compensation due the employee."

41.     These statutes create a duty of loyalty owed by the Individual Defendants

to EMS.

42.     The Individual Defendants have violated these provisions based on the

conduct alleged above and have breached their duty of loyalty to EMS by, among other

things, using EMS's confidential information to compete with it and soliciting business

from EMS's customers or potential customers while still employed by EMS.

43.     In addition, the mass resignation of the Individual Defendants from EMS

has damaged EMS's ability to operate.

44.     EMS has been damaged by the Individual Defendants' breach of duty of

loyalty in an amount to be proven at trial.

## Count II

### (Violation of the South Dakota Trade Secrets Act – All Defendants)

45.     EMS realleges and incorporates herein the preceding allegations where

material and further states and alleges:

13

46.     The South Dakota Trade Secrets Act ("TSA"), S.D. Codified Laws § 37-29-1 *et seq.,* provides a claim for injunctive relief and damages against a person who misappropriates a trade secret.

47.     EMS's customer information, supplier information, human resources organization charts, proposals sent to certain customers, presentations prepared for industry associations, safety forms that were utilized by EMS, technical reference specifications for  certain customers, rate sheets for certain EMS customers, pricing information for certain EMS customers, EMS logos and letterhead, models that EMS developed in responding to bids, EMS labor rate sheets, bid packages for certain EMS customers, contracts with certain customers, customer background information relating to the requests for proposal from certain customers and potential customers, form agreements that have been developed by EMS, financial data relating to EMS and its customers, manuals relating to EMS's Basic Safety Training program, technical specification documents relating to EMS's customers, and presentations relating to EMS's capabilities and other information ("EMS Confidential Information") are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

48.     EMS has taken steps that are reasonable under the circumstances to maintain the secrecy or confidentiality of the EMS Confidential Information.

49.     Thus, EMS Confidential Information constitutes protected trade secrets as defined in the TSA.

50.     Defendants have misappropriated EMS's trade secrets, as that term is defined by the TSA, and, on information and belief, are using EMS's trade secrets to compete with EMS in the marketplace.

51.     EMS will be irreparably injured if Defendants are allowed to continue their unauthorized use of EMS's trade secrets.

52.     Defendants' conduct as alleged was willful and malicious, and should result in an award of actual and punitive damages and attorneys' fees against Defendants and such further relief as is provided by the TSA.

## Count III

### (Breach of Contract – Fish and Mikel)

53.     EMS realleges and incorporates herein the preceding allegations where material and further states and alleges:

54.     As stated above, Fish and Mikel each entered into written contracts in which they promised to maintain the confidentiality of EMS's confidential information.

55.     EMS performed all of its obligations under these contracts.

56.     Fish and Mikel breached their respective confidentiality obligations under these contracts.

57.     EMS has been damaged by those breaches in an amount to be proven at trial.

15

## Count IV

### (Unfair Competition – All Defendants)

58.     EMS realleges and incorporates herein the preceding allegations where material and further states and alleges:

59.     Defendants' activities, as set forth above, constitute unfair competition under South Dakota common law.

60.     EMS has been damaged by said activities in an amount to be proven at trial.

## Count V

### (Civil Conspiracy – All Defendants)

61.     EMS realleges and incorporates herein the preceding allegations where material and further states and alleges:

62.     Defendants agreed on the illegal courses of conduct described above.

63.     There was a meeting of minds among Defendants on the object of and course of action to be taken, *i.e.,* illegally competing with EMS.

64.     Defendants committed the unlawful overt acts set forth above.

65.     EMS has been damaged as a proximate result of the conspiracy in an amount to be proven at trial.

## Count VI

### (Punitive Damages – All Defendants)

66.     EMS realleges and incorporates herein the preceding allegations where material and further states and alleges:

67.     Defendants' conduct towards EMS constitutes oppression, fraud, malice and has been willful, wanton and malicious entitling EMS to punitive damages against the Defendants in an amount sufficient to make an example of and to punish the Defendants.

WHEREFORE, EMS prays that the Court grant it the following relief against all Defendants:

A.     Preliminary and permanent injunctions prohibiting further illegal activities;

B.     Compensatory damages in an amount to be proven at trial;

C.     Punitive damages in an amount to be determined at trial;

D.     Double damages as provided for in S.D. Codified Laws § 37-29-3;

E.     Attorneys fees and costs of litigation; and

F.     Such further relief as the Court deems necessary or appropriate.

17

Dated this 20ᵗʰ day of October, 2009.

SCHAFFER LAW OFFICE, PROF. LLC

Michael J. Schaffer
Paul H. Linde
Schaffer Law Office, Prof., LLC
412 West 9th Street
Sioux Falls SD 57104
Telephone: (605) 274-6760
Facsimile: (605) 274-6764
E-Mail: mikes@schafferlawoffice.com

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury on all issues of fact.

18